[Cite as *In re Y.M.*, 2022-Ohio-677.]

COURT OF APPEALS
TUSCARAWAS COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:

Y.M., Q.D., M.D., & Y.M.

JUDGES:
Hon. W. Scott Gwin, P.J.
Hon. William B. Hoffman, J.
Hon. Craig R. Baldwin, J.

Case Nos. 2021 AP 09 0020, 2021 AP 09
0021, 2021 AP 09 0022, & 2021 AP 09
0023

O P I N I O N

CHARACTER OF PROCEEDINGS:     Appeal from the Tuscarawas County
                              Court of Common Pleas, Juvenile
                              Division, Case No. 19 JN 00245

JUDGMENT:                     Affirmed

DATE OF JUDGMENT ENTRY:       March 8, 2022

APPEARANCES:

For Appellee - Tuscarawas County        For Mother – Rhonda Hudson-McNutt
Job & Family Services
JEFF M. KIGGANS                         MELISSA ULRICH
389 – 16th Street, SW                   P.O. Box 2306
New Philadelphia, Ohio 44663            North Canton, Ohio 44720-1068

For Father – Nathaneal McNutt

PATRICK J. WILLIAMS, ESQ.
300 E. 3rd Street
Dover, Ohio 44622

*Hoffman, J.*

**{¶1}** In Tuscarawas App. No. 21-20, appellant Nathaneal McNutt ("Father") appeals the August 4, 2021 Judgment Entry entered by the Tuscarawas County Court of Common Pleas, Juvenile Division, which terminated his parental rights with respect to his minor child ("Child 3") and granted permanent custody of Child 3 to appellee Tuscarawas County Job and Family Services ("TCJFS"). In Tuscarawas App. Nos. 21-21, 21-22, and 21-23, appellant Rhonda Hudson McNutt ("Mother") appeals the same judgment entry with respect to her minor children ("Child 1", "Child 2", "Child 3", individually; and "the Children", collectively).

STATEMENT OF THE CASE AND FACTS

**{¶2}** Mother is the biological mother of the Children. Father is the biological father of Child 3. The biological fathers of Child 1 and Child 2 are unknown.

**{¶3}** Mother and Father moved to Ohio with the Children in late July, 2019. Shortly thereafter, TCJFS received a report from an anonymous caller expressing concerns about the family. TCJFS had also received information from Denver (Colorado) Human Services. Denver Human Services advised TCJFS their department and Denver police became involved with the family following a July 5, 2019 incident in which Child 1 was outside of Mother's vehicle, standing on the running boards and holding onto the car, while the vehicle was in motion. The family was living in their vehicle at the time. When the Denver Human Services caseworker contacted Mother, she advised the caseworker the family had moved to Texas. A warrant against Mother based upon the July 5, 2019 incident was issued and remains outstanding.

{¶4}    Based upon the report and the information, TCJFS and two detectives from the Tuscarawas County Sheriff's Department made contact with the family on July 26, 2019.  The family was living in a tent on property owned by Father's relative, who would not allow Mother and the Children inside the residence.  Because it was summertime, the conditions were minimally acceptable, although not ideal, and TCJFS allowed the Children to remain with Parents.  Mother refused any assistance from TCJFS.  TCJFS made numerous attempts to reestablish contact with the family.

{¶5}    In early August, 2019, TCJFS learned the family was living at a campground at Atwood Lake.  TCJFS later received a report the family had been at a homeless shelter in New Philadelphia, but left because they refused to comply with the rules of the shelter.  On August 27, 2019, TCJFS received a report the family was living in their vehicle in the parking lot of Marsh Industries. New Philadelphia police confirmed officers had conducted a welfare check on August 26, 2019.  TCJFS requested a welfare check on the evening of August 27, 2019, however, the family was no longer at Marsh Industries.

{¶6}    On August 28, 2019, TCJFS requested, and the trial court granted, an ex parte pick-up order for the Children.  The Children were removed from Parents the following day.  The trial court ordered no contact or visitation between the Children and Parents.  TCJFS filed a complaint for neglect and dependency on August 30, 2019.  Via Judgment Entry filed August 30, 2019, the trial court granted emergency temporary custody of the Children to TCJFS and appointed Attorney Mary Warlop as Guardian ad Litem ("GAL") for the Children.  Mother and Father subsequently filed motions for visitation.

{¶7}   The trial court conducted an adjudicatory hearing on October 22, 2019. TCJFS moved to amend the complaint to delete certain allegations.   The trial court granted the requested amendments.  Parents stipulated to the amended complaint.  The trial court found the Children to be neglected and dependent, continued temporary custody with TCJFS, and adopted the case plan.  The trial court denied Parents' requests for visitation until Parents commenced case plan services and completed their psychological evaluations.

{¶8}   Parents' case plans required them to complete psychological evaluations; complete Goodwill Parenting; provide verification of housing and income; refrain from criminal activity; submit to drug testing; complete drug and alcohol assessments; and attend monthly meetings with the caseworker.

{¶9}   On July 24, 2020, TCJFS filed a motion for a six-month extension of temporary custody.  The trial court set the motion for hearing at the annual review on August 24, 2020.   Upon agreement of the parties, the trial court granted a six-month extension of temporary custody.  The trial court also ordered TCJFS to conduct a home study of James Stepney, Mother's cousin, and his partner.

{¶10} On November 13, 2020, Father filed a motion, requesting the trial court order TCJFS to conduct home studies of Mother's sisters, Jimilah Lundy and Tanisha Arnold.  TCJFS filed a response.  Via Judgment Entry filed December 1, 2020, the trial court overruled Father's motion for home study.

{¶11} On January 14, 2021, TCJFS filed a Motion to Modify Prior Disposition, seeking permanent custody of the Children.  The trial court conducted a hearing on the motion over a period of three days, June 15, July 7, and July 9, 2021.

{¶12} The following evidence was adduced at the hearing.

{¶13} Jamie Gunder, the TCJFS ongoing caseworker assigned to the family, testified the fathers of Child 1 and Child 2 were unknown. The father of Child 3 is Father. Gunder indicated, between August 28, 2019, and January 14, 2021, the date of the filing of the motion to modify, the Children had continuously been in the temporary custody of TCJFS. Child 1 had been in foster care in Nevada between December, 2013, and January, 2014, while Mother was in jail. Child 1 and Child 2 had been in foster care in Nevada between February, 2017, and April, 2018. During this time, Mother became involved with Father.

{¶14} Gunder stated she did not believe Parents were able to provide a legally secure placement for the Children as they failed to accept responsibility for their behaviors and actions which led to the initial removal of the Children. Parents had not successfully completed counseling. Gunder noted both Mother and Father changed counselors multiple times because the counselors did not agree with them. Parents do have stable housing. Father was working, but not consistently. Mother received Social Security Disability.

{¶15} Gunder testified the family moved to Ohio on July 23, 2019. TCJFS received records from family services in both Colorado and Nevada, which revealed concerns regarding the parenting of the Children. When TCJFS became involved with the family, they were living in a tent on the property of a family member. Thereafter, they temporarily lived in an RV in a church parking lot, a tent at Atwood Lake, and a homeless shelter. After leaving the homeless shelter because they would not follow the rules, the family lived in a van on the property of Marsh Industries. Gunder explained TCJFS's

primary concerns were the family's homelessness, Mother's mental health, and Child 1 not attending school.

{¶16} Father did not successfully complete Goodwill Parenting. Mother received a certificate of attendance. Mother and Father were charged with shoplifting in December, 2019. The charge against Mother was reduced to trespassing. Gunder believed the charge against Father was dismissed. During a conversation with Father's counselor in July, 2020, Gunder learned Father had six staples in the back of his head. Father told his counselor the injury was the result of Mother hitting him. When Gunder confronted Father, Father admitted Mother hit him. Father later recanted and said a random stranger on the street struck him in the back of the head and he woke up and did not know where he was.

{¶17} Although Gunder never had any concerns about her own physical safety, she testified the director of TCJFS received a protection order against Mother in November, 2019. Mother posted pictures of the director and his children on Facebook, accusing him of child trafficking. Mother also called the director and told him he was a demon. At one point, Gunder and Jennifer Fire, the Goodwill instructor, advised Mother Child 3 had a "nursemaid elbow" in which the elbow slips out of joint. Mother began sending emails declaring Child 3's arm had been broken and he was being abused in foster care. Mother once gave permission for Child 3 to have a haircut. Mother then asserted his hair fell out because of his vaccinations. Parents signed releases for their counselors' records, but immediately rescinded the releases and Gunder was unable to secure any records.

**{¶18}** Mother met with Gunder on a monthly basis until TCJFS filed the motion for permanent custody. Mother told Gunder she (Gunder) had betrayed her and refused to meet with Gunder thereafter. Mother became pregnant while the case was pending. Parents moved to Stark County. Stark County Department of Job and Family Services received custody of the newborn immediately after his birth. A permanent custody hearing was scheduled for August 5, 2021.

**{¶19}** In September, 2019, Parents began counseling at the Wellmore Center. Mother with Dr. Mark Welty and Father with David Marsh. Parents transferred and began counseling in May, 2020, with Anne Meyers of the Village Network in Canton. Parents discontinued counseling with Meyers in November, 2020. Thereafter, Mother saw Dr. Baker in Cincinnati, until February, 2021, when he discontinued seeing her. Mother told Gunder Dr. Baker told her she was a "train wreck." In March, 2021, Mother began seeing Latoya Logan. Mother was still in counseling at the time of the hearing. Father was also in counseling at the time of the hearing.

**{¶20}** TCJFS began a home study of Mother's cousin, James Stepney, and his husband, who lived in Colorado. However, Colorado would not consider the couple for placement because Stepney's husband was an alcoholic and had relapsed. Another relative, Cynthia Stout, expressed interest in taking the Children. However, Stout had an extensive history with the agency and TCJFS denied her request for a home study. Other suggested individuals were not appropriate or did not want the Children. Mother's sisters, Tanisha Arnold and Jimilah Lundy, were not considered for placement during the Nevada cases. Additionally, both sisters only had two-bedroom homes, which could not accommodate the Children. Mother's mother was living with Lundy. Mother had been

permanently removed from her mother's care, which created another concern about placing the Children with Lundy. Lundy never contacted TCJFS or requested a home study.

**{¶21}** Gunder testified, on March 5, 2021, Child 1 was placed in therapeutic foster care. Prior to this placement, Child 1 had been in a residential placement. Child 2 was in a foster home, but her behaviors escalated and she was moved to Fox Run, a lockdown facility. Child 2 is currently at a restrictive facility in Toledo. Gunder stated neither Child 1 nor Child 2 could function in a family-like setting at this point. Child 3 has been in the same foster home since the beginning of the case. The newborn is placed in the same foster home. The Children underwent trauma assessments with Carrie Schnirring at Lighthouse. Child 1 and Child 2 were diagnosed with post-traumatic stress disorder. Child 1 and Child 3 are doing well. Child 2 accepts no responsibility, has no remorse when she harms others, refuses to follow rules, and is "just very angry." Tr., Vol. I at 48. Gunder believed the best interest of the Children would be served by granting permanent custody to TCJFS.

**{¶22}** Mary Warlop, the GAL for the Children, testified she has talked to Child 1 and Child 2 regarding their wishes. Child 1 related she wishes to stay with her current foster family and be adopted by them. Child 1 told Warlop she does not want to have any contact with her family of origin because "they are bad." Tr. at 109. Child 1 has no remaining bond with Mother. Child 1 is well adjusted in her foster home. Warlop added she has never seen Child 1 so happy or growing as much as she is currently. Child 2 told Warlop she feels safe in her current placement. Child 2 did not express a desire to see Parents. Child 3 is extremely well taken care of by his foster family. He is bonded with

and attached to his foster parents.  He is also extremely attached to his newborn sibling.

Warlop recommended the trial court grant permanent custody of the Children to TCJFS

as it was in the Children's best interest and such would facilitate adoption.

**{¶23}** Dr. Aimee Thomas, a psychologist with Lighthouse Family Center,

conducted a psychological assessment of Mother.  During the assessment, Mother

revealed she sustained significant abuse during her childhood.  She was exposed to

domestic violence in her family home and ultimately placed in foster care, where she was

physically, emotionally, and sexually abused.  During her adult life, Mother was involved

in criminal activity, including the sale of illicit drugs, prostitution, and domestic violence.

Mother reported a history of marijuana and cocaine use.

**{¶24}** Mother reported prior diagnoses of bipolar disorder, attention deficit

hyperactivity disorder ("ADHD"), and post-traumatic stress disorder.  Dr. Thomas noted

the symptoms Mother described to her were consistent with those mental health

disorders.  Mother informed Dr. Thomas she did not want to be prescribed medication to

address her mental health issues, but wanted to self-medicate with marijuana.

**{¶25}** Based upon the information obtained during the assessment, Dr. Thomas

diagnosed Mother with bi-polar disorder with psychosis.  Mother's full-scale IQ was

identified as 79, which indicates she is on a below average range of intellectual ability.

Dr. Thomas added Mother's IQ did not prevent her from learning and she could benefit

from parenting skills training.  Mother identified herself as a victim of physical and

emotional abuse in prior adult relationships.  Although Mother acknowledged anger

management problems in the past, she minimized concerns with such problem to Dr.

Thomas.    Dr. Thomas stated data provided by TCJFS suggested Mother's anger management issues had persisted.

**{¶26}** Dr. Thomas gave Mother the Minnesota Multiphasic Personality Inventory ("MMPI-2"), which assesses mental disorders such as depression, anxiety, schizophrenia, bipolar disorder, as well as personality characteristics.    Mother's profile was not valid, which indicates an inconsistent pattern of responding, too many missed questions, or high defensiveness in responding.    Dr. Thomas also gave Mother another inventory, the Millon Clinical Multiaxial Inventory ("MCMI-IV").    Mother's pattern of responding indicated she is easily angered, bored, rebellious, rash, and unrestrained.    Dr. Thomas stated, based upon Mother's responses, there were concerns Mother may have a tenuous grasp of reality.    Dr. Thomas explained individuals with MCMI-IV profiles consistent with Mother's profile "include major depressive disorder, recurrent, bipolar disorder with psychotic features, histrionic personality disorder, paranoid personality disorder, and narcissistic personality disorders."   Tr., Vol. I at 134.   Mother's "defensive approach" to the Substance Abuse Subtle Screening Inventory ("SASSI-4") "negated the utility of this instrument."   *Id.*

**{¶27}** Dr. Thomas stated she did not believe Mother has good insight into her current situation.   When asked to explain, Dr. Thomas replied:

> At the time I met with her, I would say that her limited insight was certainly reflected in her refusal to take prescribed psychotropic medications that would stabilize her mood and assist her in making progress in counseling sessions and participating in parenting skills training.

So, the failure to recognize the need to participate in such services really was reflected by a lack of follow through, at least during the timeframe that I had met with her. *Id.* at 136.

**{¶28}** Dr. Thomas also diagnosed Mother with paranoid personality disorder, antisocial personality disorder, and borderline personality disorder. Dr. Thomas explained an individual with borderline personality disorder has an unstable sense of self, swinging from being okay one minute to being enraged the next. Borderline personality disorder can be treated with dialectical behavioral therapy. Dr. Thomas emphasized this therapy takes commitment from the individual to learn skills to become more self-aware. Dr. Thomas did not believe Mother should participate in Goodwill Parenting until she was stabilized on psychotropic medication as such would offer her the best opportunity to learn the information presented. Dr. Thomas described Mother's mental health issues as "very severe." *Id.* at 140. Dr. Thomas opined "reunification should not be considered unless and until [Mother] is committed to taking her medication as directed." *Id.* at 141.

**{¶29}** After concluding her psychological testing of Father, Dr. Thomas diagnosed him with an unspecified personality disorder. She stated Father is a more dependent and passive person, who is inclined to tolerate unhealthy relationships. Dr. Thomas explained "individuals with these characteristics have difficulty protecting themselves and children from individuals who may be abusive, or may have underlying mental health issues and can't control their emotions." *Id.* at 143. At the time Dr. Thomas evaluated Father, she did not believe he could protect the Children from Mother's mood swings. Father has a full-scale IQ of 93, which suggests he functions in the average range of ability. Dr.

Thomas indicated Father was capable of learning appropriate parenting interactions, but the overarching issue was his codependent relationship with Mother.

**{¶30}** Dr. Steven Dean, a psychologist and the clinical director of Melymbrosia Associates, testified he completed psychological assessments of Mother and Father.  Dr. Dean indicated Mother had a history of trauma, which included physical, verbal, emotional, and sexual abuse during her multiple foster placements as a child.  Mother advised Dr. Dean she received Social Security Disability.  Mother had a history of drug abuse.  Mother had five other children, but did not have custody of any of them.  Dr. Dean described Mother's adult life as "hedonistic," explaining "a lot of it was, kind of, some drugs, alcohol, you know, pleasure seeking.  Tr., Vol. II at 169.  He added: "some of it was survival probably, too, for her. I think it was her way of trying to, kind of, make it in a world with some of the partners that she was with.  That, a lack of work history, kind of relying on other people." *Id.* Dr. Dean stated Mother perceived herself as being victimized and was prone to avoid introspection.

**{¶31}** Dr. Dean diagnosed Mother with antisocial personality disorder.  An individual with antisocial personality disorder has difficulty following rules, impulsivity, a lack of regard and concern for other people.  Dr. Dean noted antisocial personality disorder is treatable, but requires a good deal of therapy and a lot of work.  This disorder would have a negative effect on an individual's ability to parent.  Dr. Dean did not have access to Mother's complete records; therefore, could not provide a definitive diagnoses of borderline personality disorder and bipolar disorder.

**{¶32}** With respect to Father, Dr. Dean testified Father's greatest difficulty is his inability to set effective boundaries and to assert himself.  Father had no significant

pathology.  Dr. Dean described Father as an introverted man with dependency issues. Father tends to let other individuals make decisions for him.  Dr. Dean diagnosed Father with dependent personality disorder.  Dr. Dean had concerns about Father's ability to say "no" and set boundaries for the Children.  Dr. Dean believed Father would benefit from medication and psychotherapy as well as couple's therapy.

{¶33}  Jennifer Fire, the supervisor of the Goodwill Parenting Program, testified neither Mother nor Father successfully completed the parenting program.  Mother participated in two separate classes.  Mother was terminated from the first class due to her attendance, missing 6 of 15 days.  Mother was permitted to participate in a second class as she had given birth to the newborn.  Mother did not successfully complete the second class because she failed to sufficiently complete her goals.  Mother would not accept responsibility for her involvement with TCJFS and the removal of the Children from her home.

{¶34}  Mother's visits with Child 3 and the newborn were "very chaotic."  *Id.* at 207. Mother's "go to method [of disciplining] was pointing at [Child 3] with her pointer finger and screaming no in his face."  *Id.* at 207-208.  In turn, Child 3 would mimic Mother's behavior.  Although Mother recognized what was happening, she continued to discipline Child 3 in the same way.  Mother was observed grabbing, yanking, and pulling Child 3 by his arm or wrist.  When Child 3 would throw himself on the floor, Mother would attempt to pull Child 3 upright with one hand while she was holding the newborn in her other hand. The Goodwill staff repeatedly instructed Mother not to handle Child 3 in that manner, however, week after week, Mother continued the same pattern.  Fire indicated one of the

biggest areas of concern with Mother's visits was her inability to carry a skill or recommendation from week to week.

{¶35} From the onset, Fire had concerns about Mother giving inappropriate food to Child 3, including Lifesaver candies and mints. Mother would also provide food items to Child 3 which were too large. Child 3 was observed shoving whole chicken nuggets into his mouth. On one occasion, Child 3 choked on granola. Mother was advised not to bring granola again. The following week, Mother brought granola. She would sneak and give Child 3 entire chocolate chip cookies under the table. Child 3 would shove the entire cookie into his mouth. Mother would say she did not think he would do that despite the same thing happening week after week for seven weeks. Fire described Mother as "very reactive and a lot of screaming." *Id.* at 209. Over the course of her visits, Fire had ongoing concerns about Mother's ability to care for Child 3 and the newborn simultaneously, maintain safety, and provide structure and routine.

{¶36} Mother failed to complete her four individual goals. Mother's goals were: 1. to assume responsibility for her involvement with TCJFS; 2. to recognize how her parenting affected Child 1 and Child 2, both in the past and presently; 3. to provide a detailed list of her criminal history; and 4. to create a calendar of scheduled visits with her mental health providers and to attend the scheduled appointments. Mother completed only 6 of the 11 generalized goals. Significantly, Mother was unable to define and provide wrong examples of discipline and punishment.

{¶37} With respect to Father, Fire explained Father did not successfully complete Goodwill Parenting because he was unable to assume responsibility and refused to acknowledge Mother's past behaviors and the trauma to the Children. Safety was an

issue during Father's visits with Child 3. Father allowed Child 3 to stand on a rolling chair and run around the room. Father would arrive at visits without Mother and then realize she was supposed to be at the visit as well. Father would spend an hour frantically trying to hide his cell phone and make calls to get Mother to the visits. Father would not pay attention to Child 3 and the newborn, leaving the staff to chase after Child 3. Fire opined Father was unable to adequately parent Child 3 and the newborn on his own. Father was not able to appropriately supervise Child 3. Fire had safety concerns following her two home visits with Parents.

{¶38} Dr. Mark Welty of the Wellmore Center testified on Parents' behalf. Dr. Welty was Mother's therapist from September, 2019, until September 1, 2020, and saw her for approximately 31 sessions. Although Mother disclosed drug use in the past, Dr. Welty found Mother did not need to be treated for substance use disorder at the time he was seeing her. The focus of his treatment was to help emotionally stabilize Mother as she worked through the case with TCJFS. Dr. Welty indicated Mother became less guarded with him over the course of their relationship. Mother was more open and forthcoming, but remained untrusting of the system.

{¶39} Dr. Welty referred Mother to Anne Meyers. Dr. Welty explained he is not licensed and certified to work with children, and if reunification was going to occur, child and family therapy would be warranted. Therefore, he thought it made sense to make a transition in the therapeutic process so Parents could establish a relationship with a therapist who would be able to work with the family.

{¶40} Linda Popp-Walker, a licensed professional clinical counselor, testified she worked with Mother from October 28, 2020, until June 9, 2021, and Father from December

2, 2020, until June 9, 2021. Mother attended 18 of her 26 scheduled appointments with Popp-Walker.  Popp-Walker diagnosed both Mother and Father with adjustment disorder mixed with anxiety and depression.

**{¶41}** Popp-Walker practices "short-term, directed, goal oriented, in-depth, psychodynamic type of therapy * * * in the state of hypnosis."  Tr. Vol. III at 361.  Popp-Walker was unable to conduct these types of sessions with Mother because Mother was in constant turmoil due the legal matter at hand.  Because she was doing crisis management with Parents, Popp-Walker felt Parents needed a more comprehensive place for treatment, which would provide them with a case manager, a therapist, and a psychiatrist.  Popp-Walker stated she felt Mother would benefit from prescription medication to help her through the crisis.

**{¶42}** Latoya Logan, a licensed independent social worker and trauma therapist with Project Lift Services, testified she began working with Mother at the end of February, 2021, and Father in early March, 2021.  Logan diagnosed Mother with post-traumatic stress disorder, chronic, and bipolar disorder.  Logan worked with Parents individually and as a couple.  Over time, Mother was able to identify goals and was committed to working towards those goals.  Logan's focus with Mother was emotional regulation.  With Father, Logan worked on assertive communication and self-worth.  Although Logan described Mother's behavior as hostile and aggressive during many of the sessions, Logan added such was an understandable response given the circumstances.

**{¶43}** Natatia Peterson, a health and wellness coordinator with Alliance for Children and Families, testified Parents participated in an eight-session parenting program focused on preventing violence against children.  The majority of participants

have their children at homes when they are involved in the program. Peterson noted the program was more effective when the children are in the home. She modified the program for Parents. Peterson found Parents receptive to the subject matter. Parents were cooperative and engaged.

{¶44} Rebecca Watkins, a licensed counselor, testified she began working with Mother through Telehealth in March, 2021. Watkins has had 13 sessions with Mother and Mother is still a patient. Watkins attempted to help Mother work through her case plan. The focus was Mother's emotional regulation. Watkins diagnosed Mother with adjustment disorder with mixed anxiety and depressed mood and post-traumatic stress disorder. Although Mother has shown improvement, Watkins felt if Mother "could keep working on it, and keep going in this direction," she could continue to improve. *Id.* at 438.

{¶45} Jimilah Lundy, Mother's younger sister, testified she lives in Tennessee, just outside of Memphis, and is employed with the United States Department of Treasury for the Internal Revenue Service ("IRS"). Lundy indicated she does not have any problem with drugs or alcohol and does not have a criminal record. During the hiring process for her position at the IRS, Lundy passed a federal background check and received Homeland Security clearance. Lundy lived with Mother, Child 1, and Child 2 in Las Vegas for a period of time in 2016. Lundy eventually moved into her own apartment. She lived in Las Vegas for two or three years.

{¶46} While Mother's case with Job and Family Services in Las Vegas was pending, Lundy did not request custody of Child 1 and Child 2. Lundy explained, "My sister was gonna get her children back, so I never asked for the children. And, at the time, I wasn't able to take care of the children." *Id.* at 480. Lundy did not have full-time

employment and did not have a vehicle.  Lundy added her teenaged sons, her younger

sister, and her nephew were living with her at the time and she did not have room.  Lundy

described Mother as "great" with her children and noted her children love her.

**{¶47}** Lundy acknowledged Mother had a problem with drugs and alcohol in the

past.  She had no current concern Mother was using drugs or alcohol.  Lundy stated

Mother has better control over her mental health, attends therapy, and takes her

medication.  She had no concerns with the trial court returning the Children to Parents.

**{¶48}** Currently, Lundy resides in a two-bedroom, two-bath apartment.  Lundy

would be willing to move to a larger apartment to accommodate the Children.  Financially,

Lundy would be able to care for the Children.  On cross-examination, Lundy agreed her

current residence is not large enough for the Children.   Lundy was unaware Child 1 and

Child 2 were in different placements because of their behaviors around each other.  Lundy

believed Mother's "mental health isn't a question" and the Children should be returned to

her custody. *Id.* at 501.  Lundy acknowledged she would return the Children to Parents

"if it's all done with the Courts, and everything is done, and she's completed everything,

yeah."  *Id.* at 503.  On re-direct, Lundy indicated she would not give the Children to

Parents if they had not completed the case plan.

**{¶49}** Parents testified on their own behalf.  Father stated he loves Mother and

will ensure she has a good home and provides for the Children.  Father has been working

at Amazon since March, 2021.  Mother receives $800/month in Social Security benefits.

Parents moved into a six-bedroom home in Alliance on February 6, 2020.  They have

maintained the home and the rent is current.   Both stated their belief they could properly

care for the Children.  Mother feels she has addressed all of TCJFS's concerns, but would

be willing to continue to work services with TCJFS.  Mother admitted to yelling at Father and the Children, but denied ever striking any of them.  Mother takes CBD gummies to help with anxiety.  She no longer takes the medication she was prescribed because "I like being who I am."  Mother added she has herself under control.  Tr., Vol. IV at 666.

{¶50}  Via Judgment Entry filed August 4, 2021, the trial court terminated Parents' parental rights and granted permanent custody of the Children to TCJFS.  The trial court found Parents "have failed to continually and repeatedly to substantially remedy the conditions causing removal.  Aug. 4, 2021 Judgment Entry at 13.  The trial court further found the Children could not and should not be placed with with either Mother or Father within a reasonable time and it was in the Children's best interest to grant permanent custody to TCJFS.

{¶51}  It is from this judgment entry Parents appeal.

{¶52}  In Tuscarawas App. No. 21-20, Father raises the following assignment of error:

THE TRIAL COURT ERRED IN ITS AUGUST 4, 2021 JUDGMENT ENTRY GRANTING PERMANENT CUSTODY TO THE TUSCARAWAS COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES.  THE DEPARTMENT FAILED TO ABIDE BY THEIR LEGAL REQUIREMENT TO ATTEMPT TO PLACE THE CHILD(REN) WITH A SUITABLE RELATIVE, IF POSSIBLE.

{¶53} In Tuscarawas App. Nos. 21-21, 21-22, and 21-23, Mother raises the following assignments of error:

I. THE TRIAL COURT ERRED IN ITS AUGUST 4, 2021 JUDGMENT ENTRY GRANTING PERMANENT CUSTODY OF APPELLANT'S MINOR CHILDREN TO THE TUSCARAWAS COUNTY DEPARTMENT OF JOB & FAMILY SERVICES BECAUSE THE DEPARTMENT FAILED TO MAKE REASONABLE EFFORTS TO REUNITE THE MINOR CHILDREN WITH THEIR MOTHER.

II. THE TRIAL COURT'S AUGUST 4, 2021 JUDGMENT ENTRY GRANTING PERMANENT CUSTODY OF APPELLANT'S MINOR CHILDREN TO THE TUSCARAWAS COUNTY DEPARTMENT OF JOB & FAMILY SERVICES WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

III. THE TRIAL COURT'S AUGUST 4, 2021 JUDGMENT ENTRY GRANTING PERMANENT CUSTODY OF APPELLANT'S MINOR CHILDREN TO THE TUSCARAWAS COUNTY DEPARTMENT OF JOB & FAMILY SERVICES IS NOT IN THE CHILD'S [SIC] BEST INTEREST.

IV. THE TRIAL COURT ERRED IN ITS AUGUST 4, 2021 JUDGMENT ENTRY GRANTING PERMANENT CUSTODY TO THE TUSCARAWAS COUNTY DEPARTMENT OF JOB & FAMILY SERVICES BECAUSE THE DEPARTMENT FAILED TO PERFORM AN ICPC FOR

THE CHILD'S [SIC] AUNT, JIMILAH LUNDY, OR OTHERWISE CONSIDER HER FOR PLACEMENT OF THE MINOR CHILDREN.

**{¶54}** These cases come to us on the expedited calendar and shall be considered in compliance with App. R. 11.2(C).

MOTHER

I

**{¶55}** In her first assignment of error, Mother argues the trial court erred in granting permanent custody of the Children to TCJFS because the Department failed to make reasonable efforts to reunify the Children with her.

**{¶56}** The Ohio Revised Code imposes a duty on the part of children services agencies to make reasonable efforts to reunite parents with their children where the agency has removed the children from the home. R.C. 2151.419. "Case plans are the tools that child protective service agencies use to facilitate the reunification of families who * * * have been temporarily separated." *In re Evans*, 3d Dist. Allen No. 1-01-75, 2001 WL 1333979, *3, 2001 Ohio App. LEXIS 4809, 3 (Oct. 30, 2001). To that end, case plans establish individualized concerns and goals, along with the steps that the parties and the agency can take to achieve reunification. *Id.*

**{¶57}** " 'Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification.' " *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and Wyandot Nos. 16-12-16, 2013-Ohio-4317, ¶ 95, quoting *In re D.A.*, 6th Dist. Lucas No. L-11-1197, 2012-Ohio-1104, ¶ 30. "In determining whether the agency made

reasonable efforts [pursuant to R.C. 2151.419(A)(1)] to prevent the removal of the child from the home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re Lewis*, 4th Dist. No. 03CA12, 2003-Ohio-5262, at ¶ 16. " 'Reasonable efforts' does not mean all available efforts." *Id.* A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011(12th Dist. 1992).

**{¶58}** As set forth in our Statement of the Case and Facts, supra, TCJFS made reasonable efforts to reunite Mother with the Children by establishing a workable case plan which included services to address concerns with Mother's mental health, her parenting skills, and chronic homelessness. Mother participated in two sessions of Goodwill Parenting classes. Mother requested the opportunity to retake the class a third time, but the request was denied. Mother underwent two psychological assessments. Dr. Aimee Thomas testified Mother's mental health issues were "very severe" and opined reunification should not be considered until Mother was consistently taking medication. Both Dr. Thomas and Dr. Dean questioned Mother's ability to adequately parent due to her own significant issues. Mother refused to take any prescribed medication, using CBD gummies for her anxiety. Mother saw one counselor after another. Mother was opposed to every suggested treatment plan.

**{¶59}** Mother asserts TCJFS's refusal to grant her visitation with Child 1 and Child 2 exacerbated her own childhood trauma. The trial court deemed visitation not in the best interest of Child 1 and Child 2, which was the focus of the proceedings. The lack of visitation does not constitute a failure to use reasonable efforts.

**{¶60}** We note a reasonable efforts determination is not required at a permanent custody hearing under R.C. 2151.353(A)(4) when the record demonstrates such determination was made earlier in the proceedings. *In re N.R.*, 8th Dist. Cuyahoga No. 110144, 2021-Ohio-1589, ¶ 38, citing *In re A.R.*, 8th Dist. Cuyahoga No. 109482, 2020-Ohio-5005, ¶ 32.  However, if the agency has not established reasonable efforts have been made prior to the permanent custody hearing, then it must demonstrate such efforts at that time.  *In re N.R.* at ¶ 38, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43.  In this case, after each hearing which resulted in the removal of the Children from Mother's custody or continued their placement outside the home, the trial court found TCJFS used reasonable efforts to prevent their continued removal or to make it possible for them to safely return home.  *See* R.C. 2151.419(A)(1).  At no time did Mother or any other party challenge the reasonable efforts findings.

**{¶61}** Nonetheless, we find TCJFS used reasonable efforts to reunify the Children with Mother.

**{¶62}** Mother's first assignment of error is overruled.

MOTHER

II, III

**{¶63}** In her second assignment of error, Mother maintains the trial court's decision to grant permanent custody of the Children to TCFJS was not supported by clear and convincing evidence.  In her third assignment of error, Mother challenges the trial court's finding granting permanent custody to TCJFS was in the Children's best interest.

**{¶64}** As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent

and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries* (Feb. 10, 1982), Stark App. No. CA5758. Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.* (1978), 54 Ohio St.2d 279.

**{¶65}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long term foster care.

**{¶66}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply: (a) the child is not abandoned or orphaned, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or (d) the child has been in the temporary custody of one or more public children services agencies or private child placement agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.

**{¶67}** Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial

court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d)is present before proceeding to a determination regarding the best interest of the child.

**{¶68}** If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

**{¶69}** As set forth in our Statement of the Facts and Case, supra, we find there was sufficient and substantial competent evidence to support the trial court's grant of permanent custody to TCJFS. Mother failed to remedy the problems which initially caused the removal of the Children from her home.  Despite two years of case plan services, Mother failed to accept any responsibility for her past behavior and viewed herself as the victim.  Mother did not successfully complete parenting classes.  Mother has not been consistent with counseling, moving from one counselor to another.  She refused to take prescription medication despite being advised of the necessity by mental health providers. Mother's behavior was described as erratic, inappropriate, and overall concerning throughout the pendency of the case.

**{¶70}** We note the trial court found, pursuant to R.C. 2151.414(B)(1)(d), the Children had been in the temporary custody of TCJFS for a period of time in excess of twelve of the prior twenty-two consecutive months.  Mother does not challenge this

finding.  The 12 of 22 finding alone, in conjunction with a best interest finding, is sufficient to support the grant of permanent custody. *In re Calhoun,* 5th Dist. No. 2008CA00118, 2008-Ohio-5458, ¶ 45.

**{¶71}** The record establishes the following with respect to best interest.  The Children underwent trauma assessments with Carrie Schnirring at Lighthouse.  Child 1 and Child 2 were diagnosed with post-traumatic stress disorder.  On March 5, 2021, Child 1 was placed in therapeutic foster care.  Prior to this placement, Child 1 had been in a residential placement.  Child 1 wishes to stay with her current foster family and be adopted by them.  Child 1 does not want to have any contact with Parents because "they are bad." Tr. at 109.  Child 1 has no remaining bond with Mother. Child 1 is well adjusted in her foster home.  The GAL stated she has never seen Child 1 so happy or growing as much as she is currently.

**{¶72}** Child 2 was in a foster home, but her behaviors escalated and she was moved to a lockdown facility.  Child 2 is currently at a restrictive facility in Toledo.  Child 2 feels safe in her current placement.  Child 2 did not express a desire to see Parents.

**{¶73}** Child 3 has been in the same foster home since the beginning of the case. The newborn is placed in the same foster home.  Child 3 is extremely well taken care of by his foster family.  He is bonded with and attached to his foster parents.  He is also extremely attached to his newborn sibling.

**{¶74}** Dr. Thomas opined "reunification should not be considered unless and until [Mother] is committed to taking her medication as directed." The GAL recommended TCJFS be granted permanent custody of the Children.

**{¶75}** Based upon the foregoing, we find the trial court's decision to grant permanent custody of the Children to TCJFS is not against the manifest weight of the evidence. We also find the trial court's finding it was in the Children's best interests to grant permanent custody to TCJFS is not against the manifest weight of the evidence.

**{¶76}** Mother's second and third assignments of error are overruled.

MOTHER

IV

FATHER

I

**{¶77}** In Mother's fourth and Father's sole assignments of error, Parents contend the trial court erred granting permanent custody to TCJFS because the Agency failed to consider placement of the Children with their maternal aunt.

**{¶78}** *In re Schaefer,* 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, the Supreme Court of Ohio held a trial court's statutory duty, when determining whether it is in the best interest of a child to grant permanent custody to an agency, does not include finding by clear and convincing evidence that no suitable relative was available for placement. *Id.* at ¶64. The *Schaefer* Court explained R.C. 2151.414 "requires the court to find the best option for the child once a determination has been made pursuant to R.C. 2151.414(B)(1)(a) through (d). The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors." *Id.* Instead, a child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security. *In re Adoption of Ridenour,* 61 Ohio St.3d 319, 324,

574 N.E.2d 1055 (1991). Thus, courts are not required to favor relative placement if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. *Schaefer* at ¶ 64; *accord In re T.G.,* 4th Dist. Athens No. 15CA24, 2015-Ohio-5330, 2015 WL 9303036, ¶ 24; *In re V.C.,* 8th Dist. Cuyahoga No. 102903, 2015-Ohio-4991, 2015 WL 7777606, ¶ 61 (stating relative's positive relationship with child and willingness to provide an appropriate home did not trump child's best interest).

**{¶79}** At the permanent custody hearing, Lundy testified she lives in a two-bedroom, two-bathroom apartment. She expressed a willingness to move if granted custody of the Children. Lundy was unaware of Child 1 and Child 2's behavioral issues. Lundy stated Mother has better control over her mental health, attends therapy, and takes her medication. She had no concerns with the trial court returning the Children to Parents. Lundy acknowledged she would return the Children to Parents "if it's all done with the Courts, and everything is done, and she's completed everything, yeah." *Id.* at 503. Lundy indicated she contacted TCJFS on one occasion, but had no further contact from the Agency.

**{¶80}** We find the trial court had no duty to consider placing the Children with Lundy before granting permanent custody to TCJFS. Child 1 and Child 3 are doing well in their foster placements. Child 2 has extreme behavior issues and is currently in a residential facility where she feels safe. Child 1 and Child 2 were unable to be placed together because of their behavior toward each other. Lundy had no grasp of the seriousness of the trauma Child 1 and Child 2 suffer as the result of Mother's mental health issues.

**{¶81}** Mother's fourth and Father's sole assignments of error are overruled.

{¶82} The judgment of the Tuscarawas County Court of Common Pleas, Juvenile

Division, is affirmed.


By: Hoffman, J.

Gwin, P.J.  and

Baldwin, J. concur